UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| PETER A. LUEBKE, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HI-CRUSH PARTNERS LP, ROBERT E. RASMUS, JAMES M. WHIPKEY, LAURA C. FULTON, JEFFRIES V. ALSTON III, ROBERT L. CABES, JR., JOHN R. HUFF, TREVOR T. TURBIDY, STEVEN A. WEBSTER, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., CREDIT SUISSE SECURITIES (USA) LLC, RBC CAPITAL MARKETS LLC, UBS SECURITIES LLC, RAYMOND JAMES & ASSOCIATES and ROBERT W. BAIRD & CO. INCORPORATED,<br><br>Defendants. | No. 12 CIV 9212<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>**JURY TRIAL DEMAND**<br><br> |

Plaintiff Peter A. Luebke ("Plaintiff") alleges the following based upon the investigation

of plaintiff's counsel, which included a review of United States Securities and Exchange

Commission ("SEC") filings by Hi-Crush Partners LP ("Hi-Crush" or the "Company"),

regulatory filings and reports, press releases and other public statements issued by Hi-Crush, and

media reports about Hi-Crush. Plaintiff believes that substantial additional evidentiary support

will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.     This is a securities class action brought by Plaintiff on behalf of a class (the

"Class") comprising all purchasers of the common units of Hi-Crush pursuant and/or traceable to

the false and misleading Registration Statement and Prospectus issued in connection with Hi-

Crush's August 16, 2012 initial public offering (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.     Hi-Crush describes itself as a "pure play, low-cost, domestic producer of premium monocrystalline sand, a specialized mineral that is used as a 'proppant' ["frac sand"] to enhance the recovery rates of hydrocarbons from oil and natural gas wells." Hi-Crush's reserves consist of Northern White sand, which is found predominately in Wisconsin and limited portions of the upper Midwest region of the United States, and highly valued due to its favorable physical characteristics.

3.     According to Hi-Crush, substantially all of its frac sand production is sold to pumping service providers under long-term, fixed price contracts with take-or-pay provisions that significantly reduce its exposure to short-term fluctuations in the price of and demand for frac sand. Hi-Crush's customer base comprises subsidiaries of four of North America's largest providers of pressure pumping services: Baker Hughes Incorporated ("Baker Hughes"), FTS International, LLC., Halliburton Company ("Halliburton") and Weatherford International Ltd., with Baker Hughes and Halliburton being the two largest customers. Based on contracted volumes and pricing, Hi-Crush estimates that Baker Hughes will represent 18.2% of Hi-Crush's revenue in 2012.

4.     On August 16, 2012 Hi-Crush filed a final Prospectus for its IPO, which forms part of the Registration Statement and became effective that day (collectively, the "Registration Statement").

5.     On August 21, 2012 Hi-Crush completed its IPO, selling more than 12.9 million common units to the public for $17 per share.

2

6.     The Registration Statement, however, included materially false and misleading statements and omitted material information concerning Baker Hughes, including that it failed to disclose that: (i) as early as February 2012 Baker Hughes sought to change material terms of its contract with Hi-Crush and had expressed an unwillingness to comply with the current contract; and (ii) prior to the IPO Baker Hughes began refusing to take or pay for Hi-Crush's frac sand.

7.     It was not until after the IPO that the market learned the truth about the problems in Hi-Crush's relationship with Baker Hughes.  On November 13, 2012 Hi-Crush issued a press release, stating, among other things, that "[o]n September 19, 2012, Baker Hughes provided notice that it was terminating the contract" and "[o]n November 12, 2012, Hi-Crush formally terminated the supply agreement and filed suit in the State District Court of Harris County, Texas against Baker Hughes seeking damages for Baker Hughes' prior wrongful termination of the supply agreement."

8.     As a result of this news, Hi-Crush common units dropped approximately 26%, or $5.35, to closing price of $15 per unit on November 13, 2012 on heavy volume of more than 3.3 million units traded.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act of 1933 and 28 U.S.C. Section 1331 and Section 1337.

10.     Plaintiff brings this action pursuant to 15 U.S.C. Sections 77(k), 77(1) and 77(o) of the Securities Act.

11.     Venue is proper in this District because defendants conduct business in this District and many of the wrongful acts alleged herein took place or originated in this District.

12.     Most of the defendants are headquartered or located in this district, or maintain significant business presences here.

13.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

14.     Plaintiff Peter A. Luebke purchased Hi-Crush common units pursuant and/or traceable to the Registration Statement and was damaged thereby.

15.     Defendant Hi-Crush is a Delaware limited partnership formed in May 2012 to own and operate certain of the businesses that have historically been conducted by its sponsor, Hi-Crush Proppants LLC.  The principal executive offices of Hi-Crush are situated at Three Riverway, Suite 1550, Houston, Texas.  Hi-Crush is managed and operated by the board of directors and executive officers of its general partner, Hi-Crush GP LLC ("Hi-Crush GP"), a wholly owned subsidiary of Hi-Crush Proppants LLC ("Hi-Crush Proppants") (collectively, "Hi-Crush" or the "Company").  Hi-Crush is engaged in the production of premium monocrystalline sand, a specialized mineral, or "proppant" which enhances hydrocarbon recovery from oil and natural gas wells.  Hi-Crush's units trade on the NASDAQ Stock Exchange (the "NASDAQ") under the symbol "HCLP."

16.     Defendant Robert E. Rasmus ("Rasmus") is Co-Chief Executive Officer ("CEO") of Hi-Crush Proppants since October 2012.  Rasmus was named Co-CEO of Hi-Crush GP in May 2012.  Rasmus signed or authorized the signing of the false and misleading Registration Statement.

4

17.     Defendant James M. Whipkey ("Whipkey") is a co-founder of Hi-Crush Proppants and has served as its Co-CEO since October 2012. Whipkey was named Co-CEO of Hi-Crush GP in May 2012. Whipkey signed or authorized the signing of the false and misleading Registration Statement.

18.     Defendant Laura C. Fulton ("Fulton") has served as the CFO of Hi-Crush Proppants since April 2012 and CFO of Hi-Crush GP since May 2012. Fulton signed or authorized the signing of the false and misleading Registration Statement.

19.     Defendant Jeffries V. Alston III ("Alston") has served as Chief Operating Officer ("COO") of Hi-Crush Proppants since May 2011 and was appointed COO of Hi-Crush GP in May 2012. Alston signed or authorized the signing of the false and misleading Registration Statement.

20.     Defendant Robert L. Cabes, Jr. ("Cabes") has served as a director Hi-Crush Proppants since May 2011 and was appointed to the board of directors of Hi-Crush GP in May 2012. Cabes signed or authorized the signing of the false and misleading Registration Statement.

21.     Defendant John R. Huff ("Huff) has served as a director of Hi-Crush Proppants since May 2011 and was appointed to the board of directors of Hi-Crush GP in May 2012. Huff signed or authorized the signing of the false and misleading Registration Statement.

22.     Defendant Trevor T. Turbidy ("Turbidy") has served as a director of Hi-Crush Proppants since May2011 and was appointed to the board of directors of Hi-Crush GP in May 2012. Turbidy signed or authorized the signing of the false and misleading Registration Statement.

23.     Defendant Steven A. Webster was previously a director of Hi-Crush and signed or authorized the signing of the false and misleading Registration Statement.

5

24.     These defendants described in ¶¶16-23 are collectively referred to herein as the "Individual Defendants."

25.     Defendant Morgan Stanley & Co. LLC served as an underwriter to Hi-Crush in connection with the IPO.

26.     Defendant Barclays Capital Inc. served as an underwriter to Hi-Crush in connection with the IPO.

27.     Defendant Credit Suisse Securities (USA) LLC served as an underwriter to Hi-Crush in connection with the IPO.

28.     Defendant RBC Capital Markets LLC served as an underwriter to Hi-Crush in connection with the IPO.

29.     Defendant UBS Securities LLC served as an underwriter to Hi-Crush in connection with the IPO.

30.     Defendant Raymond James & Associates served as an underwriter to Hi-Crush in connection with the IPO.

31.     Defendant Robert W. Baird & Co. Incorporated served as an underwriter to Hi-Crush in connection with the IPO.

32.     These defendants described in ¶¶25-31 are collectively referred to herein as the "Underwriter Defendants."

33.     All defendants are collectively referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Hi-Crush common units pursuant or traceable to Hi-Crush's false and

misleading Registration Statement for its IPO, and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of Hi-Crush, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

35.     The members of the Class are so numerous that joinder of all members is impracticable. Hi-Crush stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Hi-Crush or its transfer agent and maybe notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Hi-Crush has approximately 13.6 million units outstanding.

36.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

37.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

38.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are;

a.     whether the federal securities laws were violated by defendants' acts as alleged herein;

7

b.      whether statements made by defendants to the investing public in the Registration Statement misrepresented material facts about the business and financial prospects of Hi-Crush; and

c.      to what extent the members of the Class have sustained damages and the proper measure of damages.

39.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members maybe relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

40.      On August 16, 2012 Hi-Crush filed a final Prospectus for its IPO, which forms part of the Registration Statement and became effective that day.

41.      On August 21, 2012 Hi-Crush completed its IPO, selling more than 12.9 million common units to the public for $17 per share.

42.      The Registration Statement included numerous misstatements and omissions of material facts, including:

*Customers and Contracts*

Our current customer base is comprised of subsidiaries of four of North America's largest providers of pressure pumping services: Baker Hughes Incorporated ("Baker Hughes"), FTS International, LLC. ("FTS International"), Halliburton Company ("Halliburton") and Weatherford International Ltd. ("Weatherford"). Our largest customers based on current contracts, Baker Hughes and Halliburton, are each rated A2 / A by Moody's and Standard & Poor's,

respectively, and Weatherford is rated Baa2 / BBB by these agencies. FTS International Services LLC, the subsidiary of FTS International that is the counterparty to our customer contract, is rated Ba3 / B by these agencies. ...

We sell substantially all of the frac sand we produce under long-term, take-or-pay contracts that significantly reduce our exposure to short-term fluctuations in the price of and demand for frac sand. For the year ended December 31, 2011 and the first half of 2012, we generated 99% of our revenues from frac sand delivered under our long-term sand sales contracts, and we expect to continue selling a significant majority of our sand under long-term contracts. As of June 30, 2012, we had four long-term sand sales contracts with a weighted average remaining life of approximately 4.6 years. The following table presents a summary of our contracted volumes and revenues from 2011 through 2015, as well as the average contract sales price and make-whole price our customers are obligated to pay in the event they decline to accept delivery of the required product volumes under their respective contracts.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 |
| Contracted Volumes (tons) | 331,667 | 1,216,667 | 1,460,000 | 1,295,000 | 1,130,000 |
| % of Processing Capacity(1) | 79% | 85% | 91% | 81% | 71% |
| Contracted Revenue | $19,916,667 | $78,966,667 | $96,466,667 | $88,350,000 | $80,100,000 |
| Average Sales Price per ton | $60 | $65 | $66 | $68 | $71 |
| Average Make-Whole Price per ton | $60 | $49 | $49 | $51 | $51 |

(1) Percentage of processing capacity for 2011 and 2012 based on weighted average processing capacity for such periods.

As the above table illustrates, when one of our contracts expires in 2014, the average contracted price per ton will increase. The expiring contract provides for sales prices lower than current market prices. Prior to this contract's expiration, we will seek to renew or replace this contract on pricing terms more comparable to market prices at the time. Occasionally, if we have excess production and market conditions are favorable, we may elect to sell frac sand in spot market transactions.

The terms of our customer contracts, including sand quality requirements, quantity parameters, permitted sources of supply, effects of future regulatory changes, force majeure and termination and assignment provisions, vary by customer. As indicated in the above table, our customer contracts contain penalties for non-performance by our customers, with make-whole prices averaging approximately $49 per ton in 2012. If one of our customers fails to meet its minimum obligations to us, we would expect that the make-whole

payment, combined with a decrease in our variable costs (such as royalty payments and excavation costs), would substantially mitigate any adverse impact on our cash flow from such failure. ...

\* \* \*

### Business Strategies

Our primary business objective is to increase our cash distributions per unit over time. We intend to accomplish this objective by executing the following strategies:

*Focusing on stable, long-term, take-or-pay contracts with key customers.* A key component of our business model is our contracting strategy, which seeks to secure a high percentage of our cash flows under long-term, fixed price contracts with take-or-pay provisions, while also staggering the tenors of our contracts so that they expire at different times. We believe this contracting strategy significantly mitigates our exposure to the potential price volatility of the spot market for frac sand in the short-term, allows us to take advantage of any increase in frac sand prices over the medium-term and provides us with long-term cash flow stability. As current contracts expire or as we add new processing capacity, we intend to pursue similar long-term contracts with our current customers and with other leading pressure pumping service providers. We intend to utilize nearly all of our processing capacity to fulfill these contracts, with any excess processed frac sand first offered to existing customers and the remaining amount sold opportunistically in the spot market.

\* \* \*

### Competitive Strengths

We believe that we are well positioned to successfully execute our strategy and achieve our primary business objective because of the following competitive strengths:

*Long-term contracted cash flow stability.* We will generate substantially all of our revenues from the sale of frac sand under long-term contracts that require subsidiaries of Baker Hughes, FTS International, Halliburton and Weatherford to pay specified prices for specified volumes of product each month. We believe that the take-or-pay volume and pricing provisions and the long-term nature of our contracts will provide us with a stable base of cash flows and limit the risks associated with price movements in the spot market and any changes in product demand during the contract period. We are currently contracted to sell 1,460,000 tons of frac sand annually from our Wyeville facility, and as of June 30, 2012, our contracts had a weighted average remaining life of approximately 4.6 years.

\* \* \*

10

*Assumptions and Considerations*

As we discuss in further detail below, we believe that increased income from a full year's operation of the Wyeville facility, the completion of our plant expansion in March 2012, the termination of certain royalty agreements in July 2012 and commencement of deliveries under our contracts with subsidiaries of Baker Hughes and FTS International in May 2012 will result in our generating higher cash available for distribution for the twelve months ending September 30, 2013. The assumptions and estimates we have made to support our ability to generate the estimated cash available for distribution are set forth below. ...

All of the revenues estimated for the forecast period are expected to be generated from long-term sales contracts that require our customers to pay a specified price for a specified volume each month. Accordingly, our estimate of total revenue for the twelve months ending September 30, 2013 is based on our current operating capacity and the pricing terms and volume commitments specified in our long-term sales contracts rather than on our historical revenues. Our estimate assumes that we will make sales of our total contracted volume of 1,460,000 tons of frac sand at contract prices over the forecast period. We generated $54.5 million in revenues for the twelve months ended June 30, 2012. The expected $41.9 million increase in our revenues from the twelve months ending September 30, 2013, compared to the twelve months ended June 30, 2012, is primarily due to 588,150 tons of incremental frac sand sales that were contracted as part of the March 2012 plant expansion.

\* \* \*

Approximately 91% of our processing capacity at the Wyeville facility for the remainder of 2012 and through the second quarter of 2014 is contracted for sale under our existing fixed price, take-or-pay contracts with our customers, and 71% of our processing capacity is contracted for the remainder of 2014 through the second quarter of 2016. ...

In October 2011, we signed a long term, take-or-pay contract with a third customer, a subsidiary of Baker Hughes. In May 2012, we signed a one year take-or-pay contract with a fourth customer, a subsidiary of FTS International. Sales to Baker Hughes and FTS International accounted for the balance of revenue in the six months ended June 30, 2012. Based on contracted volumes and pricing, sales to Halliburton, Weatherford, Baker Hughes and FTS International will represent 49.1%, 20.9%, 18.2% and 11.8% of our contracted revenue in 2012, respectively.

43.     The statements described above either misrepresented or omitted material facts required to be stated therein, or failed to disclose material facts necessary to make the statements

not misleading because they failed to disclose that Baker Hughes had sought to modify or cancel its contract with Hi-Crush prior to the IPO.

44.     The agreement with Baker Hughes was material to the success of Hi-Crush, representing approximately 18.2% of its projected 2012 revenue.

45.     As early as February 2012, Baker Hughes had attempted to modify its contract with Hi-Crush, and eventually terminated the contract on September 19, 2012.   Hi-Crush, however, failed to disclose the termination of the Baker Hughes contract until November 13, 2012, when Hi-Crush filed with the SEC a Form 8-K, which stated in relevant part:

> In May 2012, Hi-Crush Operating LLC ("Hi-Crush"), a subsidiary of Hi-Crush Partners LP (the "Partnership"), entered into a supply agreement for frac sand with Baker Hughes Oilfield Operations, Inc. ("Baker Hughes"). On September 19, 2012, Baker Hughes provided notice that it was terminating the contract. The Partnership believes that Baker Hughes' termination was wrongful and a direct effort to circumvent its binding purchase obligations under the supply agreement. The Partnership engaged in discussions with Baker Hughes after receiving the notice, but the parties were unable to reach a mutually satisfactory resolution of the matter. On November 12, 2012, Hi-Crush formally terminated the supply agreement and filed suit in the State District Court of Harris County, Texas against Baker Hughes seeking damages for Baker Hughes' prior wrongful termination of the supply agreement. The Partnership intends to vigorously enforce its rights under the supply agreement against Baker Hughes. The Partnership cannot provide assurance, however, as to the outcome of this lawsuit.

46.     Then, on November 12, 2012 Hi-Crush filed a complaint for breach of contract against Baker Hughes in the District Court of Harris County, Texas.

47.     The complaint, *Hi-Crush Operating LLC v. Baker Hughes Oilfield Operations, Inc.*, No. 201267261, states, among other things:

> Approximately one year ago, Baker signed a six-year "take –or-pay" contract to purchase frac sand from Hi-Crush (the "Supply Agreement"). Now, apparently unhappy with the contract it signed, Baker attempted to walk away from its obligations entirely, causing substantial injury to Hi-Crush.  To make matters worse, Baker has wrongfully tried to shift the blame for its breach to Hi-Crush,

even going so far as to issue its own, sham notice of termination of the Supply Agreement.

48.    The Registration Statement, however, failed to disclose that Baker Hughes had attempted to modify the Supply Agreement as early as February 2012, to reduce its purchase obligations under the agreement.

49.    Although the complaint states that on September 19, 2012 "Baker sent Hi-Crush a letter purporting to terminate the Supply Agreement based on two meritless allegations that Hi-Crush had breached the *confidentiality obligations* contained in Article 6 of the Supply Agreement," Hi-Crush failed to disclose Baker Hughes' letter to the public until November 13, 2012.

50.    In addition, the complaint states that "[o]n September 25, 2012, Hi-Crush sent Baker a formal response setting forth the numerous reasons that Baker's purported termination of the Supply Agreement was wrongful and ineffective.  Hi-Crush notified Baker that its purported termination and repudiation of the Supply Agreement, along with its *continuing refusal* to take or pay for Hi-Crush's sand, was itself a material breach by Baker of the Supply Agreement."

51.    Although the complaint reveals that Hi-Crush sent its formal response to Baker Hughes on September 25, 2012, little more than one month after the IPO, the Registration Statement failed to disclose that Baker Hughes was refusing (and continuing to refuse) to take or pay for Hi-Crush's frac sand.  It was not until after the IPO that investors learned the truth about the problems in Hi-Crush's relationship with Baker Hughes.

52.    On November 13, 2012 Hi-Crush issued a press release stating, among other things, that "[o]n September 19, 2012, Baker Hughes provided notice that it was terminating the contract" and "[o]n November 12, 2012, Hi- Crush formally terminated the supply agreement

13

and filed suit in the State District Court of Harris County, Texas against Baker Hughes seeking damages for Baker Hughes' prior wrongful termination of the supply agreement."

53.     As a result of this news, Hi-Crush common units dropped approximately 26%, or $5.35, to a closing price of $15 per unit on November 13, 2012.

## CLAIMS FOR RELIEF

## COUNT I

### For Violations of Section 11 of the Securities Act
### (Against All Defendants)

54.     Plaintiff repeats and realleges each and every allegation contained above.  This count is predicated upon Defendants' strict liability for making false and materially misleading statements in the Registration Statement.

55.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

56.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

57.     Hi-Crush is the registrant for the IPO.  The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

58.     As issuer of the units, Hi-Crush is strictly liable to Plaintiff and the Class for any misstatements and omissions.

59.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

14

60.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

61.     Plaintiff acquired Hi-Crush common units pursuant and/or traceable to the Registration Statement for the IPO.

62.     Plaintiff and the Class have sustained damages.  The value of Hi-Crush common units has declined substantially subsequent to and due to defendants' violations.

63.     At the time of their purchases of Hi-Crush, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to November 13, 2012.  Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiff filed this complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this complaint.

## COUNT II

### For Violations of §15 of the Securities Act
### (Against Hi-Crush and the Individual Defendants)

64.     Plaintiff repeats and realleges each and every allegation contained above.

65.     This count is asserted against Hi-Crush and the Individual Defendants and is based upon §15 of the Securities Act.

66.     Hi-Crush and the Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Hi-Crush within the meaning of §15 of the Securities Act.  Hi-Crush and

15

the Individual Defendants had the power and influence and exercised the same to cause Hi-Crush to engage in the acts described herein.

67.     Hi-Crush and the Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

68.     By virtue of the conduct alleged herein, Hi-Crush and the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Awarding compensatory damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

D.     Awarding rescissionary damages; and

E.     Awarding such equitable, injunctive or other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

16

Dated: December 18, 2012          GLANCY BINKOW & GOLDBERG LLP

                                  By: _Gregory Linkh_____
                                       Gregory B. Linkh (GL0477)
                                  77 Water Street, 7th Floor, Suite 720
                                  New York, NY 10005
                                  Telephone: (646) 722-4180
                                  Facsimile: (310) 201-9160
                                  Email: glinkh@glancylaw.com

                                  GLANCY BINKOW & GOLDBERG LLP
                                  Elizabeth M. Gonsiorowski (EG1212)
                                  30 Broad Street, Suite 1401
                                  New York, New York 10004
                                  Telephone:   (212) 382-2221
                                  Facsimile:   (212) 382-3944
                                  Email: egonsiorowski@glancylaw.com

                                  -and-

                                  GLANCY BINKOW & GOLDBERG LLP
                                  Lionel Z. Glancy
                                  Michael Goldberg
                                  1925 Century Park East, Suite 2100
                                  Los Angeles, California 90067
                                  Telephone:   (310) 201-9150
                                  Facsimile:   (310) 201-9160
                                  Email: info@glancylaw.com

                                  **Attorneys for Plaintiff**

GLANCY BINKOW & GOLDBERG LLP

**SWORN CERTIFICATION OF PLAINTIFF**
**HI-CRUSH PARTNERS LP SECURITIES LITIGATION**

I, _Peter A. Luebke_____, certify that:

[Please Print Your Name]

1.    I have reviewed the Complaint and authorized its filing.

2.    I did not purchase Hi-Crush Partners LP, the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    My transactions in Hi-Crush Partners LP during the Class Period set forth in the Complaint are as follows:

I bought _2500_____ shares on _10/09/12__ at $_21.27_____ per share

I bought _____ shares on ____/____/____ at $ _____ per share

I bought _____ shares on ____/____/____ at $ _____ per share

I bought _____ shares on ____/____/____ at $ _____ per share

I sold _____ shares on ____/____/____ at $ _____ per share

I sold _____ shares on ____/____/____ at $ _____ per share

(List Additional Transactions On Separate Page If Necessary)

5.    I have not served as a representative party on behalf of a class under this title during the last three years, except for the following:_____

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: _12•03•12_

[Please Sign Your Name Above]